# Whether the President May Sign a Bill by Directing That His Signature Be Affixed to It

The President need not personally perform the physical act of affixing his signature to a bill he approves and decides to sign in order for the bill to become law. Rather, the President may sign a bill within the meaning of Article I, Section 7 by directing a subordinate to affix the President's signature to such a bill, for example by autopen.

July 7, 2005

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked whether, having decided to approve a bill, the President may sign it, within the meaning of Article I, Section 7 of the Constitution, by directing a subordinate to affix the President's signature to it, for example by autopen. This memorandum confirms and elaborates upon our earlier advice that the President may sign a bill in this manner. *See* Memorandum for Alberto R. Gonzales, Counsel to the President, from M. Edward Whelan III, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Signing of H.J. Res. 124* (Nov. 22, 2002) ("Whelan Memorandum"). We emphasize that we are not suggesting that the President may delegate the decision to approve and sign a bill, only that, having made this decision, he may direct a subordinate to affix the President's signature to the bill.[1]

Our analysis proceeds as follows: In Part I, we examine the legal understanding of the word "sign" at the time the Constitution was drafted and ratified and during the early years of the Republic. We find that, pursuant to this understanding, a person may sign a document by directing that his signature be affixed to it by another. We then review opinions of the Attorney General and the Department of Justice and find the same understanding reflected in opinions addressing statutory signing requirements in a variety of contexts. Reading the constitutional text in light of this established legal understanding, we conclude that the President need not personally perform the physical act of affixing his signature to a bill to sign it within the meaning of Article I, Section 7. In Part II, we consider the settled interpretation of the related provisions of the same section of the Constitution that require that bills be presented to the President and that the President return to Congress bills he disapproves, and find that this interpretation confirms our view of Article I, Section 7's signing requirement. In Part III, we consider practice and precedent relating to the constitutional signing requirement and show that they do not foreclose our conclusion.

---

[1] Practical reasons why the President might wish to proceed in this manner are apparent. For example, the President may be away from Washington, D.C., when Congress presents an enrolled bill to the White House, and he may wish it to take effect immediately (for example to prevent a government shutdown, to avoid lapses in authority, or to approve new authorities without delay).

## I.

Article I, Section 7 provides in relevant part as follows:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approves he shall sign it, but if not he shall return it with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it.

U.S. Const. art. I, § 7, cl. 2. Neither the constitutional text nor the drafting and ratification debates provide further guidance regarding what it means for the President to "sign" a bill he approves. *See* Memorandum for Gerald D. Morgan, Special Counsel to the President, from Malcolm R. Wilkey, Assistant Attorney General, Office of Legal Counsel, *Re: Responsibility of the President to Sign Bills Passed by the House and the Senate* at 2 (Aug. 19, 1958) ("Wilkey Memorandum") ("Research has not disclosed any record of debate concerning the specific responsibility which the Founding Fathers sought to place upon the President by the word 'sign.' Nor does any evidence give reason to think that the word was used other than in its commonly-understood meaning."). However, the word "sign" had a generally understood legal meaning that was well established at common law when the Constitution was drafted and ratified and that continued throughout the Republic's early years (and beyond). Under this well-settled legal understanding, an individual could sign a document by directing that his signature be affixed to it by another. Opinions of the Attorney General and the Department of Justice have repeatedly applied this understanding in various contexts to conclude that Executive Branch officials, including the President, may satisfy statutory signing requirements in this manner. This settled understanding of the meaning of "sign" leads us to conclude that Article I, Section 7 permits the President to sign a bill by directing a subordinate to affix the President's signature to it.

## A.

We begin with the common law meaning of the word "sign" at the time the Constitution was drafted and ratified and during the early years of the Republic. It is well settled that "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States*, 342 U.S. 246, 263 (1952). A similar rule of construction applies in constitutional interpretation. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 54 (2004) (holding that the constitutional right of the accused "'to be confronted with the witnesses against

him,' Amdt. 6, is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding"); *Payton v. New York*, 445 U.S. 573, 591 (1980) (interpreting the Fourth Amendment prohibition of "unreasonable searches and seizures" by looking to "the common-law understanding of an officer's authority to arrest" as "obviously relevant, if not dispositive" evidence "of what the Framers of the Amendment might have thought to be reasonable"). As Justice Story explained, "[t]he existence, therefore, of the common law is not only supposed by the constitution, but is appealed to for the construction and interpretation of its powers." *United States v. Coolidge*, 25 F. Cas. 619, 619 (C.C.D. Mass. 1813) (No. 14,857) (Story, J.) (listing, as examples, various provisions of the Constitution that must be interpreted in light of the common law), *rev'd on other grounds*, 14 U.S. 415 (1816). Common law decisions from the early years of the Republic can also illuminate the original meaning of the constitutional text, absent evidence that they reflect a break with common law principles that prevailed at the time the Constitution was drafted and ratified. *See, e.g.*, *United States v. Watson*, 423 U.S. 411, 418–20 (1976) (looking at early common law decisions in interpreting the Fourth Amendment's reasonableness requirement); *In re Winship*, 397 U.S. 358, 361–62 (1970) (same for Due Process Clause of the Fifth Amendment).

At the time the Constitution was drafted and ratified, and continuing thereafter, courts in England and the United States applied the rule that "when a document is required by the common law or by statute to be 'signed' by a person, a signature of his name in his own proper or personal handwriting is not required." *Finnegan v. Lucy*, 157 Mass. 439, 440 (1892) (noting that this rule "was and still is very generally held"; collecting early English and American authorities); *see also id*. at 443 ("Signing does not necessarily mean a written signature, as distinguished from a signature by mark, by print, by stamp, or by the hand of another."). Rather, under the "principle of signatures," the common law recognized that one could sign a document not only with one's own hand, but also by the hand of another who was properly authorized to affix one's signature to the document on one's behalf or who did so in one's presence. Furthermore, a document signed in one's name by the hand of another in either of these manners was equally effective as a document signed with one's own hand.

Although the precise origins of the principle of signatures are not clear, they appear to trace back at least as far as *Lord Lovelace's Case*, 82 Eng. Rep. 140, Sir Wm. Jones Rep. 268 (J. Seate 1632), where it was said:

> [I]f one of the officers of the forest put one seal to the Rolls by assent of all the Verderers, Regarders, and other Officers, it is as good as if every one had put his several seal, as in case divers men enter into an Obligation, and they all consent, and let but one seal to it, it is a good Obligation of them all.

*Id.* at 141. This case thus appears to have recognized that a person required to seal a document need not affix his seal to it personally if he agrees to be bound by the seal of another and, more generally, that the identity of the person who affirms a legal document need not correspond to the identity of the person who affixes a mark upon that document to signify that affirmation.[2]

English courts subsequently extended the principle recognized in *Lord Lovelace's Case* to situations where one person actually affixes another's signature to a document. In *Nisi prius coram Holt*, 12 Mod. Rep. 564, 564 (1701), Chief Justice Holt held that "if a Man has a Bill of Exchange, he may authorize another to indorse his Name upon it by Parol; and when that is done, it is the same as if he had done it himself." Importantly, this case held that the law will not distinguish a document signed by one's own hand from a document signed in one's name by the hand of another acting on one's behalf. The signature is equally valid if it is affixed in either manner. Thus, by 1701, *Nisi prius coram Holt* and *Lord Lovelace's Case* had established the fundamental basis for the principle of signatures.

Some have traced the principle of signatures even earlier, to *Combe's Case*, decided in 1614. As reported by Chief Justice Coke, this case held that when one person has authority to act for another, he should do so in the name of the person on whose behalf he acts. The court explained:

> [W]hen any has authority as attorney, to do any act, he ought to do it in his name who gives the authority, for he appoints the attorney to be in his place, and to represent his person; and therefore the attorney cannot do it in his own name, nor as his proper act, but in the name and as the act of him who gives the authority. . . . [B]ut if attornies have power by writing to make leases by indenture for years, &c. they cannot make indentures in their own names, but in the name of him who gives the warrant.

*Combe's Case*, 77 Eng. Rep. 843, 847, 9 Co. Rep. 75, 76–77 (1614).[3] This decision firmly established that an agent could, and often must, affix his principal's signature to legal documents to conduct business on the principal's behalf. As one court later observed, "[i]t does not appear that the authority of

---

[2] The "Verderers, Regarders, and other Officers" referred to in *Lord Lovelace's Case* comprised the Court of Sweinmote, a forest court that, among other things, would certify convictions for violations of the forest laws to the Court of Justice Seate for entry of judgment. 3 William Blackstone, *Commentaries* *72. Although the language quoted in the text appears to reflect the argument of the Attorney General, nothing in the terse report of this decision suggests that the Court disagreed with this language, and litigants and judges in subsequent cases have treated it as reflecting the holding of the Court. *See, e.g.*, *Ball v. Dunsterville*, 100 Eng. Rep. 1038, 1039, 4 Term Rep. 313, 314 (K.B. 1791); *Simonds v. Ludlow*, 2 Cai. Cas. 1 (N.Y. Sup. Ct. 1805); *Cady v. Sheperd*, 28 Mass. 400, 404 (1831).

[3] Chief Justice Coke's reporter does not clearly indicate whether *Combe's Case* was decided by the Court of Common Pleas or the Court of King's Bench.

*Combe's* case is at all shaken by more modern decisions. All concur in laying it down as an indispensable requisite, to give validity to a deed executed by an attorney, that it should be made in the name of the principal." *Elwell v. Shaw*, 16 Mass. 42, 46 (1819); *see also Stone v. Wood*, 7 Cow. 453, 454 (N.Y. Sup. Ct. 1827) ("When an agent or attorney contracts on behalf of his principal, he must do so *in the name* of the principal, or the latter is not bound. When any one has authority to do an act, it should be done in the name of him who gives the authority; not in the name of the attorney. All the subsequent cases agree in the law as thus laid down by Coke. There is no contradiction on the subject."). Significantly for our purposes, it appears to have been generally understood, as a corollary to the rule set down in *Combe's Case*, that "[w]hen the name of the principal is subscribed by his agent, the former is liable in his own name on the contract, *because, in law, the signature is his*." *Patterson v. Henry*, 27 Ky. 126, 127 (1830) (emphasis added); *see also Locke v. Alexander*, 8 N.C. 412, 415 (1821) ("Attorneys are the mere instruments of their principals: the principals act by them, and the act, to be the act of the principal, must be done in his name.").

The principle of signatures was thus established by *Lord Lovelace's Case*, *Nisi prius coram Holt*, and *Combe's Case* long before the Constitution was drafted and ratified, and, with increasing frequency, courts in England and the United States continued to apply the principles set forth in these cases during the drafting and ratification period and the early years of the Republic. They did so most frequently in the context of agency law. Because the law of agency permitted a principal to conduct virtually any business through an agent, agents often would be called upon to sign documents in the course of exercising their delegated authority, and courts generally upheld agreements signed by an agent in his principal's name. *See, e.g.*, *Wilks v. Back*, 102 Eng. Rep. 323, 324, 2 East 142, 144 (K.B. 1802) (Grose, J.) ("I accede to the doctrine in all the cases cited, that an attorney must execute his power in the name of his principal and not in his own name; but here it was so done"); *Campbell v. Baker*, 2 Watts 83, 84 (Pa. 1833) ("The general rule is, that a person signing a contract as an agent merely, must sign the name of his principal, as was done here.").[4]

---

[4] Conversely, most courts held that a document signed by an agent in his own name rather than his principal's was void. *See, e.g.*, *Frontin v. Small*, 92 Eng. Rep. 423, 424, 2 Ld. Ray. 1418, 1419 (Ex. 1726) ("lease was void, because it was not made in the name of James Frontin, whose house it appeared to be"); *Bogart v. De Bussy*, 6 Johns. 94, 96 (N.Y. Sup. Ct. 1810) (citing *Frontin v. Small*); *Fowler v. Shearer*, 7 Mass. 14, 19 (1810) ("it must be the act and deed of the principal, done and executed by the [agent] in his name"). The general rule, explained by Chancellor Kent, was that "[w]hen a man acts in contemplation of law, by the authority, and in the name of another, if he does an act in his own name, although alleged to be done by him as attorney, it is void." *Simonds v. Catlin*, 2 Cai. R. 61, 65 (N.Y. Sup. Ct. 1804). Courts even applied this rule in cases where it was clear that the principal intended to bind himself by a document signed by his agent, on the ground that "the law looks not to the intent alone, but to the fact whether that intent has been executed in such a manner as to

Thus, for example, consistent with *Nisi prius coram Holt*, an agent could endorse a commercial bill in his principal's name. *See, e.g.*, *Daniels v. Burnham*, 2 La. 243, 245 (1831) ("It is a general rule, to which there are few exceptions, that no person is responsible on a bill of exchange, but those who are parties to it, and whose names are on it. This rule extends, as well to bills drawn by agents as by others, and unless (with the exception of very particular cases) they sign in the name of the principal, he is not bound. So rigid is the commercial law."). As the New York Supreme Court of Judicature observed, "[t]here is no doubt that a person may draw, accept or endorse a bill by his agent or attorney, and that it will be as obligatory upon him as though it were done by his own hand." *Pentz v. Stanton*, 10 Wend. 271, 275 (N.Y. Sup. Ct. 1833). "But," the court also noted, "the agent in such case must either sign the name of the principal to the bill, or it must

---

possess a legal validity." *Clarke's Lessee v. Courtney*, 30 U.S. 319, 349 (1831) (Story, J.); *see also Elwell v. Shaw*, 16 Mass. 42 (1819).

Other courts, however, required the principal's rather than the agent's signature only for deeds and other documents under seal. *See, e.g.*, *Copeland v. Mercantile Ins. Co.*, 23 Mass. 198, 203 n.2 (1828) ("The rule that an attorney or agent, to bind his principal, must sign the name of the principal, applies only to deeds and not to simple contracts."); *New England Marine Ins. Co. v. De Wolf*, 25 Mass. 56, 61–62 (1829) ("The authorities cited to maintain the position, that the name of the principal must be signed by the agent, are of deeds only; instruments under seal; and it is not desirable that the rigid doctrine of the common law should be extended to mercantile transactions of this nature, which are usually managed with more attention to the substance than to the form of contracts."); *cf. M'Donough v. Templeman*, 1 H. & J. 156, 161 (Md. 1801) ("If an agent contracts by parol for his principal he may do so in his own name; but a deed by an attorney to bind his principal, must be in the name of the principal, and signed in his name."). And some courts held that a document signed in the agent's name would (or at least in some circumstances could) bind the *agent*. *See Taft v. Brewster*, 9 Johns. 334, 334 n.a (N.Y. Sup. Ct. 1812) ("Where one enters into a covenant, though he describes himself as the agent of another, and covenant as such, but sign and seal in his own name, he is liable personally."); *Duvall v. Craig*, 15 U.S. 45, 56 n.a (1817) ("Where a person acts as agent for another, if he executes a deed for his principal, and does not mean to bind himself personally, he should take care to execute the deed in the name of his principal, and state the name of his principal only, in the body of the deed."); *Patterson v. Henry*, 27 Ky. 126, 127 (1830) ("[A]s a general rule, the agent makes himself individually liable, by substituting his own name as agent for that of his principal."); *Godley v. Taylor*, 14 N.C. 178, 179 (1831) ("Where an agent wishes to be excused from obligations or covenants into which he enters, he should affix the name of his principal to the deed. When he does not do so, but only signs his own name as agent, he is personally answerable. For in such case he undertakes for his principal. He undertakes as agent, or as surety for his principal, that if the latter will not perform the contract, he will answer for him, in the manner stipulated.") (internal citations omitted); *cf.* 2 James Kent, *Commentaries on American Law* *631 ("The attorney who executes a power as by giving a deed, must do it in the name of his principal; for if he executes it in his own name, though he describes himself to be agent or attorney of his principal, the deed is held to be void; and the attorney is not bound, even though he had no authority to execute the deed, when it appears on the face of it to be the deed of the principal. But if the agent binds himself personally, and engages expressly in his own name, he will be held responsible, though he should, in the contract or covenant, give himself the description or character of agent."). Although, as these authorities illustrate, the consequences of an agent affixing his own name to a document instead of his principal's were not always clear, none of the authorities questioned the rule that if a properly authorized agent affixed his principal's name to a document, the signature would be as valid as if the principal had affixed it himself.

appear on the face of the bill itself, in some way or another, that it was in fact drawn for him, or the principal will not be bound. The particular form of the execution is not material, if it be substantially done in the name of the principal." *Id.*

Similarly, an agent could execute and sign a deed in his principal's name.[5] *See, e.g.*, *White v. Cuyler*, 101 Eng. Rep. 497, 497, 6 Term. Rep. 176, 177 (K.B. 1795) (Kenyon, C.J.) ("in executing a deed for the principal under a power of attorney, the proper way is to sign in the name of the principal") (citing *Combe's Case*); *M'Donough v. Templeman*, 1 H. & J. 156, 161 (Md. 1801) ("a deed by an attorney to bind his principal, must be in the name of the principal, and signed in his name"); *Stinchfield v. Little*, 1 Me. 231, 234 (1821) ("It seems to have been settled or recognized as law in Courts of justice by judges, distinguished for their wisdom and learning, in successive generations, and under different governments, that in order to bind the principal or constituent, and make the instrument his deed, the agent or attorney must set to it the name and seal of the principal or constituent, and not merely his own."); *Mears v. Morrison*, 1 Ill. 223, 223 (1827) ("The usual and appropriate mode of signing a deed by an agent or attorney, is for him to sign his principal's name, and then to sign his own name, as agent."); *Patterson v. Henry*, 27 Ky. 126, 128 (1830) ("A deed signed and sealed by the attorney in fact, and in his own name for his constituent, is not the deed of the latter; and therefore will not pass his title. The authority in such case, is simply to sign the name and affix the seal of the principal.") (internal citation omitted); *cf. Fowler v. Shearer*, 7 Mass. 14, 19 (1810) ("At common law, the deed of a married woman is not merely voidable but is absolutely void; and she may plead generally *non est factum*. But the husband may make his wife his attorney; and as his attorney she may execute a deed in his name, and may put his seal to it; and may, before a magistrate, acknowledge it to be her husband's deed. And he shall be bound by it as effectually as by a deed executed personally by himself.").

Enacted in 1677, the original Statute of Frauds incorporated the principle of signatures by providing that certain contracts, such as contracts for the sale of land, had to be in writing and signed by the persons to be bound or by "their Agents thereunto lawfully authorized." An Act for Prevention of Frauds & Perjuryes, 29 Car. II c. 3 (Eng.).[6] Accordingly, courts routinely applied the princi-

---

[5] Although not strictly required by the common law, most deeds were signed. As Blackstone explained, "it is requisite that the party, whose deed it is, should *seal*, and in most cases I apprehend should *sign* it also." 2 William Blackstone, *Commentaries* \*305; *see also* 3 William Holdsworth, *A History of English Law* 231 (1923) ("The other ceremonies attending the execution of a deed in modern times are sealing, the delivery, and the attestation of witnesses. Signature, though usual, is not necessary for validity, unless required by statute.").

[6] At the time of the Constitution's ratification, several states had adopted statutes of frauds that included this provision essentially verbatim. *See, e.g.*, An Act for Prevention of Frauds and Perjuries, 1771 Conn. Pub. Acts LXXV; An Act to Prevent Fraud and Perjury, Mass. Gen. Laws ch. 16, § 1 (1788); An Act to Prevent Frauds and Perjuries, Va., ch. 101 (1785).

ple of signatures in matters governed by the Statute. For instance, in *Merritt v. Clason*, 12 Johns. 102 (N.Y. Sup. Ct. 1815), the New York Supreme Court of Judicature held that a contract satisfied the Statute of Frauds where a broker, acting as agent for both plaintiff and defendant, wrote in the plaintiff's memoran-dum-book, "'*February* 18th, bought of *Daniel & Isaac Merritt*, (the plaintiffs), by *Isaac Wright & Son*, 10,000 bushels of good merchantable rye, at one dollar per bushel, deliverable in the last ten or twelve days of *April* next, along side any vessel or wharf the purchaser may direct, for *Isaac Clason* of *New-York*, payable on delivery.'" *Id.* at 102. The broker informed the defendant of what was written and the defendant repeatedly accepted delivery of the goods. The court held that the memorandum "was *signed* according to the statute." *Id.* at 106. The court continued:

> It is not disputed, that the authorization of the agent, for such pur-pose, need not be in writing. In the body of this memorandum the name of *Isaac Clason*, the defendant, is written by his agent, whom he had expressly authorized to make this contract. The memoran-dum, therefore, is equally binding on the defendant as if he had writ-ten it with his own hand and if he had used his own hand, instead of the hand of his agent, the law is well settled that it is immaterial, in such a case, whether the name is written at the top, or in the body, or at the bottom of the memorandum. It is equally a *signing* within the statute.

*Id.* at 106–07. Other cases reached similar results. *See, e.g.*, *Irvin v. Thompson*, 7 Ky. 295, 296 (1816) (holding that an agent validly signed a contract for the sale of real estate in his principal's name pursuant to an oral grant of authority and that the mode of appointing agents was "left . . . as it was at common law," which did not require such authority to be in writing, or it would "prevent every person who is unable to write from making a binding contract"); *cf. Shaw v. Nudd*, 25 Mass. 9, 12 (1829) (similar).

   As these cases illustrate, "[t]he common law . . . [did] not require that an au-thority to an agent to sign an unsealed paper, or a written contract, should also be by a writing. Thus, for example, an agent may, by a verbal authority, or by a mere implied authority, sign or indorse promissory notes for another." Joseph Story, *Commentaries on the Law of Agency* § 50 (1839) ("*Story on Agency*"); *see also Miller v. Moore*, 17 F. Cas. 341, 341 (C.C.D.C. 1807) (No. 9,584) ("But THE COURT permitted parol (viva voce) testimony to be offered, to show that Wellford was an agent for Alexander, and that he had been accustomed to indorse the name of Alexander on notes, and that Alexander had sanctioned such indorse-ments."); *Weightman v. Caldwell*, 17 U.S. 85, 96 n. (1819) ("The agent who is authorized to sign, need not be constituted by writing."); *Bank of Washington v. Peirson*, 2 F. Cas. 749, 749 (C.C.D.C. 1826) (No. 953) (holding that it is "not necessary that the power to indorse should be under seal"). "[E]ven where a

statute, such as the statute of frauds, require[d] an instrument to be in writing, in order to bind the party," this rule allowed a party "without writing, [to] authorize an agent to sign it in his behalf, unless the statute positively require[d] that the authority also should be in writing." *Story on Agency* § 50; *see also* 2 James Kent, *Commentaries on American Law* *511 n.a ("The agent under the statute must be a third person, and not one of the principals, and his authority may be by parol.").

Courts applied a different rule, however, with respect to deeds and other documents under seal. As Justice Story explained, "whenever any act of agency is required to be done in the name of the principal under seal, the authority to do the act must generally be conferred by an instrument under seal. Thus, for example, if the principal should authorize an agent to make a deed in his name, he must confer the authority on the agent by a deed." *Story on Agency* § 49; *see also Delius v. Cawthorn*, 13 N.C. 90, 97 (1829) ("But *Johnson*, the principal, was not bound by the specialty, because the authority of the agent was not created by deed, and power to bind the principal by an instrument under deed, can only be delegated by deed."); *Blood v. Goodrich*, 9 Wend. 68, 75 (N.Y. Sup. Ct. 1832) ("The first question is whether the agreement of December 11, 1828, is binding upon all the defendants? This contract is the basis of any liability which may rest upon any or all of the defendants. It was signed by Kingsbury, 'for self, Goodrich and Champion.' The proof of the execution by Kingsbury proves nothing against the other defendants. It shows the instrument to be the deed of Kingsbury; but to make it the deed of Goodrich and Champion, something else must be proved; it must be shown that Kingsbury had authority to act for them; and as he professes to act by deed, an authority from them under their seals is indispensable."); *M'Murtry v. Frank*, 20 Ky. 39 (1826) (explaining that authority under seal is required to authorize an agent to sign a sealed document). This rule was apparently based on the principle that "the power to execute an instrument under seal should be evidenced by an instrument of equal solemnity." *Story on Agency* § 49. Although these cases required additional formality in this context, they recognized that so long as he did so pursuant to a sealed instrument, a principal could sign and execute a document under seal by authorizing or directing an agent to affix the principal's signature and seal to it, and that the principal would be bound by a document signed and executed in this manner.

Even where the law required authorization under seal, however, the principle of signatures permitted one validly to sign or seal a document, in the absence of such formal authorization, by directing another to affix one's name or seal to the document in one's presence. *See Ball v. Dunsterville*, 100 Eng. Rep. 1038, 1039, 4 Term Rep. 313, 314 (K.B. 1791) ("*The Court* were clearly of opinion that there was no ground for the objection; that no particular mode of delivery was necessary, for that it was sufficient if the party, executing a deed, treated it as his own. And they relied principally on this deed having been executed by one defendant for himself and the other *in the presence of that other*."); *Simonds v. Ludlow*, 2 Cai. Cas. 1 (N.Y. Sup. Ct. 1805) (similar, citing *Lord Lovelace's Case* and *Ball*);

*Hanford v. McNair*, 9 Wend. 54, 56 (N.Y. Sup. Ct. 1832) ("An agent cannot bind his principal by deed, unless he has authority by deed so to do. The only exception to the rule that the authority to execute a deed must be by deed, is where the agent or attorney affixes the seal of the principal in his presence and by his direction."); *Rex v. Longnor*, 110 Eng. Rep. 599, 600, 4 B. & A. 647, 649 (K.B. 1833) (Little-dale, J.) (upholding the validity of a deed where two principals "met for the purpose of executing it, [and] their names, by their authority, were written opposite to two of the seals"); *cf. Mackay v. Bloodgood*, 9 Johns. 285 (N.Y. Sup. Ct. 1812) ("In the present case, one of the defendants sealed the bond, with one seal, for himself and his partner, with the consent of his partner, and after the partner had seen and approved of the bond, and while he was about the store, at the time of the execution. This evidence was sufficient to carry the cause to the jury, and to justify them in finding it the deed of both.").

Courts based this rule on the general principle that "what a person does in the presence of another, in his name and by his direction, is the act of the latter, as if done exclusively in his own person." *Kime v. Brooks*, 31 N.C. 218, 220 (1848); *see also Kidder v. Prescott*, 24 N.H. 263 (1851) ("an act done by one in the presence and under the control of another, for that other, is regarded not as the exercise of a delegated authority, but as the personal act of the party in whose behalf it was performed"); *Gardner v. Gardner*, 59 Mass. 483, 484 (1850) ("The execution of the deed is objected to, on the ground, that when a deed is executed by an agent or attorney, the authority to do so must be an authority of as high a nature, derived from an instrument under the seal of the grantor. This is a good rule of law, but it does not apply to the present case. The name being written by another hand, in the presence of the grantor, and at her request, is her act."). As Justice Story explained,

> [A]lthough a person cannot ordinarily sign a deed for and as the agent of another, without an authority given to him under seal; yet this is true only in the absence of the principal; for if the principal is present, and verbally or impliedly authorizes the agent to fix his name to the deed, it becomes the deed of the principal; and it is deemed, to all intents and purposes, as binding upon him, as if he had personally sealed and executed it. The distinction may seem nice and refined; but it proceeds upon the ground, that where the principal is present, the act of signing and sealing is to be deemed his personal act, as much as if he held the pen, and another person guided his hand and pressed it on the seal.

*Story on Agency* § 51.

A similar principle was expressly incorporated in the provision of the Statute of Frauds governing wills, which required that "all Devises and Bequests of any Lands . . . shall be in Writeing and signed by the partie soe deviseing the same or by some other person in his presence and by his expresse directions and shall be

attested and subscribed in the presence of the said Devisor by three or fower [4] credible Witnesses." 29 Car. II c. 3; *see also Starr v. Starr*, 2 Root 303 (Conn. Super. 1795) (discussing the statutory requirements); *Ford v. Ford*, 26 Tenn. 92 (1846) (same). Consistent with the statutory language and the principle of signatures, courts upheld wills signed in the testator's name and presence by another. *See, e.g., Cochran's Will*, 6 Ky. 491, 499 (1814) ("The will was written by David Cochran, in the absence of all other persons except the testator. The name of the testator was signed by D. Cochran—he proves that it was done under the direction of the testator. The subscribing witnesses all prove the acknowledgment of the testator that this instrument was his will, and in his presence attested the same. This is a substantial compliance with the law."); *Pate's Adm'r v. Joe*, 26 Ky. 113, 113 (1829) ("That testator's name was signed by his directions, and that witnesses subscribed their names in his presence, may be established by circumstantial evidence."). In addition, courts held that attesting witnesses could satisfy the statutory requirement that they "subscribe their names" to the will by directing that their signature be affixed to the will by another in their presence on the ground that, consistent with the principle of signatures, such a signing "should . . . , for every purpose contemplated by the law, be regarded as their own act, as much so as if it had been a deed to which they were subscribed, or as if their hands had been held and guided by another." *Upchurch v. Upchurch*, 55 Ky. 102, 113 (1855).

Consistent with its apparent origins in *Lord Lovelace's Case*, the common law principle of signatures also applied in the context of public law. Thus, for example, in reliance on the well-established rule that "the name of a party affixed to an instrument by his direction, and in his presence, is affixed by himself; whether he in fact puts his hand upon the pen or not," it was held in *Hanson v. Rowe*, 26 N.H. 327 (1853), that where "[t]he sign of the magistrate was placed upon the writ, by a mechanical act performed in his presence and under his immediate direction and inspection," it was "to every legal intent as much his sign manual as if his own hand had guided the pen which traced it." *Id.* at 329; *see also Andover v. Grafton*, 7 N.H. 298, 305 (1834) ("Had the selectman who signed the note, placed with his own name that of the other selectman who authorized him to settle the account and give a note, perhaps the evidence respecting the authority might have been sufficient to have rendered it valid, as it would then have purported to carry on its face evidence that it was the act of the town, by a majority of the selectmen; but even in that case it would deserve consideration, whether authority to do this could be delegated, and whether it could be legally done unless the other selectman was present, and assenting at the time of the execution of the paper."). And in a somewhat later case, in a context very similar to that which we consider here, the Supreme Court of the State of Missouri held that the mayor of Kansas City could approve an ordinance passed by the city counsel by directing his secretary to affix the mayor's signature to the ordinance in his presence. *Porter v. Boyd Paving & Constr. Co.*, 214 Mo. 1 (1908). The city's charter paralleled Article I, Section 7, providing that ordinances passed by the city counsel "shall be 'presented to the

mayor. If the mayor approve any ordinance he shall sign it; if not he shall return it to the city clerk with his objection, and the city clerk shall at the next session of the house in which it originated return it to such house.'" *Id.* at 10. The court relied on the principle of signatures, explaining that "[u]nquestionably it has been generally held by the courts of England and of this country that when a document is required by the common law or by statute to be 'signed' by any person, a signature of his name, in his own proper or personal handwriting, is not required." *Id.* at 11. On this basis, it concluded that the mayor could satisfy the requirements of the city's charter by directing that his signature be affixed to an ordinance by another.

Indeed, similar principles may have governed the manner in which the King of England approved bills passed by Parliament. As Blackstone explains, the King could assent to a bill either by signing it with his own hand or by directing the clerk of Parliament to manifest the King's assent in the presence of the King and Parliament. *See* 1 William Blackstone, *Commentaries* *184–85.[7]

Thus, it was well settled at common law that one could sign a legally binding document without personally affixing his signature to it. Rather, under the principle of signatures, one could sign a document by authorizing or directing another to place one's signature on it.

## B.

Opinions of the Attorney General and of this Office and its predecessors at the Department of Justice, have also recognized and applied the principle of signatures in a variety of contexts. For example, in 1824 Attorney General Wirt addressed the question "[w]hether, in cases in which the law requires that public documents shall be *signed* by the Secretary of the Treasury, that officer having been rendered by sickness unable to write his name in the usual manner, may impress his name by the use of a stamp or copperplate, instead of pen and ink; and whether instruments so signed are valid in law." *Signature of the Secretary of the Treasury*, 1 Op. Att'y Gen. 670, 670 (1824). "[P]roceed[ing] upon the postulate that the Secretary has not been so far disabled by disease but that he is capable of seeing what is done, so

---

[7] Blackstone describes in detail the two ways in which the King could assent to a bill passed by Parliament:

> 1. In person; when the king comes to the house of peers, in his crown and royal robes, and sending for the commons to the bar, the titles of all the bills that have passed both houses are read; and the king's answer is declared by the clerk of the parliament in Norman-French. . . . 2. By the statute 33 Hen. VIII. c. 21, the king may give his assent by letters patent under his great seal, signed with his hand, and notified in his absence to both houses assembled together in the high house. And, when the bill has received the royal assent in either of these ways, it is then, and not before, a statute or act of parliament.

1 William Blackstone, *Commentaries* *184–85.

that one paper cannot be passed upon him for another," *id.* at 674, Attorney General Wirt concluded:

> [I]f [the Secretary] keep the stamp or copperplate in his own possession, and either apply it himself, or cause it to be applied by another in his presence, and by his authority, I am of opinion that the instrument is as valid, in strict law, as if he had written his name with a pen. It might otherwise happen that the public might lose the services of an able officer, from a mere temporary disability in his right hand.

*Id.* at 673–74. Attorney General Wirt observed, "[w]ith regard to the signing being done *propriâ manu* of the person to be affected by it, it has been always decided that this is unnecessary—not only in wills, where the law expressly tolerates the agency of another, but in all other instruments where the law is silent—except as it speaks in the maxim that *qui facit, &c.*" *Id.* at 672. He further explained, "[t]he adoption and acknowledgment of the *signature*, though written by another, makes it a man's own. As to usage, and even official usage, I believe that by far the greater part of our judicial records are not signed by the clerk of the court himself, but are signed by deputies, who use the name of the clerk on a mere general verbal authority." *Id.* The Attorney General underscored the flexibility accorded to the Secretary of the Treasury to determine the manner in which he signs documents:

> The law requires . . . that the warrants shall be *signed* by him; but as to the method of *signing*, that is left entirely to [the Secretary]. He may write his name in full, or he may write his initials; or he may print his initials with a pen: that pen may be made of a goose quill, or of metal; and I see no *legal* objection to its being made in the form of a stamp or copperplate. It is still his act; it flows from his assent, and is the evidence of that assent. It is merely directory to the officers who are to act after him—to the Comptroller, who is to countersign; the Register, who is to record; and the Treasurer, who is to pay. . . . It is true, that the stamp may be forged; but so also may the autograph of the Secretary. There would, perhaps, be more difficulty in the latter case than in the former; and the superior facility of forging a stamp, or a copperplate, may be a very good reason why the legislature should, by a positive law, prohibit the use of it, and define *the manner* in which the *signing* shall be done. They have not yet defined it; and the word *signing* does not, as we have seen, necessarily imply, *ex vi termini*, the use of pen and ink, held and guided by the hand of the Secretary himself: it does not imply it *in legal acceptation, at least*.

*Id.* at 673.

Subsequent opinions reaffirmed Attorney General Wirt's conclusion. These opinions further recognized that an officer need not be present to satisfy a statutory

signing requirement by directing that his signature be affixed by another so long as the officer ensures—by specific authorization, instruction, or otherwise—that the signature reflects his own conscious and deliberate act. Thus, in 1917, Acting Attorney General Davis relied largely on Attorney General Wirt's analysis in concluding that the Farm Loan Commissioner could satisfy a statutory requirement that every farm loan bond contain a certificate signed by the Farm Loan Commissioner by directing another to affix "an engraved facsimile signature of the Farm Loan Commissioner" to the certificate. *Signing Certificate Attached to Farm Loan Bonds*, 31 Op. Att'y Gen. 146, 146 (1917). Davis described the reasoning in Wirt's opinion as "entirely sound" and explained that this reasoning "renders it unnecessary to construe the present act as requiring the certificate to be signed by the Farm Loan Commissioner with his own hand." *Id.* at 147. Instead, Davis observed, "[t]he requirement of the act is met if the signature of the Farm Loan Commissioner be written, stamped or engraved on the bond under circumstances which make it his own conscious and deliberate act." *Id.* He concluded:

> If he were accustomed to sign his name by a stamp rather than with pen and ink there can be no question that he might authorize this stamp to be affixed in his presence by another person in his behalf. Upon the same principle of physical agency he may authorize the Director of the Bureau of Engraving and Printing from time to time to affix his signature by engraving to certificates upon bonds identified by number or other description, so that the act of the director would be in effect the act of the commissioner himself. It is enough that the signature shall be affixed by direction of the Farm Loan Commissioner; that he shall have adopted it as his own; and that he shall have satisfied himself before the bonds have finally issued that the certificate so signed is true in point of fact.

*Id.* at 147–48.

Attorney General Gregory reached a similar conclusion with respect to statutory and regulatory requirements that certain orders and vouchers be "approved by the Department [of the Navy] or by the Chief of the Bureau of Navigation." *Affixing Facsimile Signature to Orders, Vouchers, Etc.*, 31 Op. Att'y Gen. 349, 350 (1918).[8] Relying again on Attorney General Wirt's opinion, Gregory concluded that "the affixing of this facsimile signature properly initialed by officers duly authorized thereto, under the direction and control of the Chief of the Bureau of Navigation, is a sufficient approval by the Chief of the Bureau of Navigation of

---

[8] The statute in question did not specifically require the signing of orders and vouchers. *Affixing Facsimile Signature to Orders*, 31 Op. Att'y Gen. at 350 ("The provisions of the law and the regulations respecting this matter require only that the orders and vouchers be approved by the Department or by the Chief of the Bureau of Navigation.").

the orders, vouchers, etc., which are the subject of this opinion." *Id.* at 351. Gregory concluded:

> I do not mean by this, of course, that the Chief of the Bureau of Navigation can transfer to others any duty which the law imposes upon him in connection with the approval of orders, vouchers, etc. What I do mean is, that the Chief of the Bureau having in some appropriate way passed judgment in such cases, the manual act of affixing his signature in evidence of that fact may be done by others thereunto duly authorized by him.

*Id.*

Consistent with the views of these Attorneys General, the courts have held that these sorts of facsimile signatures of public officers are in law "the true and genuine signatures of those officers." *Hill v. United States*, 288 F. 192, 193 (7th Cir. 1923) (holding in criminal prosecution for circulating false bank notes that facsimile signatures of governor and cashier of the Federal Reserve Bank of St. Louis were valid signatures).

More relevant still, for nearly 100 years the Department of Justice has applied the principle of signatures to the President's signing of various commissions. Although commissions, unlike bills, are not subject to a constitutional signing requirement, the Constitution does provide that the President "shall Commission all the Officers of the United States," U.S. Const. art. II, § 3, and various statutes dating back to as early as 1789 require that commissions for certain officers be signed by the President. For example, an act of September 15, 1789, directed the Secretary of State to

> affix the said seal to all civil commissions, to officers of the United States, to be appointed by the President by and with the advice and consent of the Senate, or by the President alone. *Provided*, That the said seal shall not be affixed to any commission, before the same shall have been signed by the President of the United States.

Act of Sept. 15, 1789, ch. 14, § 4, 1 Stat. 68, 68–69. This and similar statutes have been in force since that time. Since at least the early twentieth century, the Department of Justice has interpreted such provisions not to require the President personally to affix his signature to the covered commissions.

The Department appears first to have addressed the proper construction of such statutes when President Woodrow Wilson became ill and unable "to sign the commissions of a large number of diplomatic and consular officers of the United States, who had been appointed by him and to whose appointments the Senate had given consent." Memorandum for the Attorney General, from Alfred A. Wheat, Office of the Solicitor General, *Re: Signature of the President Upon Commissions of Presidential Postmasters* at 5 (Dec. 9, 1926) ("Wheat Memorandum") (describ-

ing this incident). The Secretary of State asked the Attorney General "whether 'you consider that I would be justified in signing in the name of the President, commissions for the officers in question and in affixing the seal of the United States to such commissions.'" *Id.* Although "hesitant about expressing the official opinion of the Department," Assistant Attorney General Brown responded, in informal advice to the Secretary of State, that "[i]t would seem to be sufficient that a commission should bear a declaration that it is an act of the President and that it is signed by the Secretary of State in his name and at his direction." *Id.*[9]

The Department reached a more definitive conclusion in 1926 with respect to a statutory requirement that the President sign postal commissions. That statute required that

> the commissions of all officers under the direction and control of the Postmaster General and the Secretary of Commerce and Labor shall be made out and recorded in the Post-Office Department and the Department of Commerce and Labor, respectively, and the Department seal affixed thereto, any laws to the contrary notwithstanding: *Provided*, that the said seal shall not be affixed to any such commission before the same shall have been signed by the President of the United States.

Pub. L. No. 58-155, ch. 1422, 33 Stat. 990, 990–91 (1905). The Postmaster General asked "whether this proviso requires the autographed signature of the President or whether the printing of his facsimile signature is sufficient to satisfy the law." Wheat Memorandum at 1. Looking to earlier opinions of the Department, especially that of Attorney General Wirt, as well as case law applying the principle of signatures, Alfred Wheat, of the Office of the Solicitor General, reasoned that "when the President's name is affixed to a commission in such manner as he shall adopt and sanction it has been signed by him." *Id.* at 3. He concluded, therefore, "[u]pon principle and authority," that "the facsimile signature of the President affixed to a commission by direction of the President and adopted by him as his signature is a compliance with the statute." *Id.* at 8. Wheat recognized, however, "that the President may not delegate the actual appointment to another official" and that "even after the Senate has advised and consented to an appointment the President may decide not to make it." *Id.* at 9. Accordingly, he indicated that his conclusion was subject to the understanding "that before any commission is recorded, sealed or issued the Postmaster General will receive the direction of the President that the commission issue to a named

---

[9] Although some historians have raised questions regarding the actual source of decisions in the White House during President Wilson's illness, it appears that the appointees who were the subject of Assistant Attorney General Brown's advice had been properly appointed by President Wilson and confirmed by the Senate before he fell ill. *See* Wheat Memorandum at 5.

person whom he has appointed to a named office." *Id*. "Whatever may be the mechanics of it," Wheat continued, "the record should show that the person appointed is the choice of the President and the 'commissioning' is the President's Act." *Id.* Wheat's memorandum and conclusions were adopted by the Attorney General and acted upon by the Postmaster.

As Acting Solicitor General, Wheat reached the same conclusion in a 1929 memorandum to the Attorney General addressing a statute that required the President to sign the commissions of certain notaries public. Memorandum for the Attorney General, from Alfred A. Wheat, Acting Solicitor General, *Re: Signature of the President on Pardon Warrants and Signatures of the President and the Attorney General on Commissions of Notaries Public in the District of Columbia* (Mar. 27, 1929) ("Wheat Notaries Memorandum"). The statute in question stated:

> That hereafter the commissions of all judicial officers . . . shall be made out and recorded in the Department of Justice, and shall be under the seal of said Department and countersigned by the Attorney General . . . : *Provided*, That the said seal shall not be affixed to any such commission before the same shall have been signed by the President of the United States.

Act of Aug. 8, 1888, ch. 786, 25 Stat. 387, 387. Noting his previous conclusion "that upon principle and authority the facsimile signature of the President affixed to a commission by direction of the President and adopted by him as his signature was a compliance with the [postal] statute," Wheat explained that "[t]he same principle applies to the question now presented." Wheat Notaries Memorandum at 1–2. Indicating that he had "no doubt whatever that . . . notarial commissions may be issued without autograph signature of the President," *id.* at 6, Wheat concluded that the President "may adopt a facsimile and direct that commissions bearing it shall issue to those whom he has appointed," *id.* at 3. *See also id.* at 4 (noting that "the President may direct that his facsimile signature be affixed to documents issued by his direction").

In 1954 this Office applied the same reasoning when asked "whether there is any way to obviate the necessity for Presidential signature of each and every commission evidencing the appointment of a United States Marshall." Memorandum for the Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Presidential Signature of Commissions of United States Marshals* at 1 (Mar. 17, 1954) ("Rankin Memorandum"). Such commissions were subject to the same statutory requirement that Acting Solicitor General Wheat had construed in 1929. *Id.* at 2. Stating that "[i]t is clear, of course, that the President cannot delegate his appointive duty," Assistant Attorney General Rankin observed that "[t]here is involved in the issuance of a commission a form of discretion which is inextricably interwoven with the act of making the appointment." *Id.* Furthermore, "[b]ecause it is apparently the intention of the statutes that the issuance of such commissions shall be the act of the President," Rankin

questioned "whether this duty is one which can properly be delegated by the President." *Id.* Relying on Wheat's "well-reasoned" previous opinions, Rankin concluded that he could "see no reason, however, why the signature of the President could not be placed on such commissions by mechanical means." *Id.* Rankin recommended as a precaution, however, "that the President sign a memorandum for the files of the White House directing that the facsimile signature be placed on commissions prepared for persons identified by name in the memorandum[, which] would enable the President to dispose of such commissions in blocks or groups merely by signing his name once for each group." *Id.* at 3.

This Office has invoked the principle of signatures in other contexts involving the President, as well. For example, in 1969 we advised that the Secretary of State could sign extradition warrants for the President pursuant to "a letter from the President to the Secretary requesting him to affix a facsimile of the President's signature, or to sign in his behalf, or both." Letter for K.E. Malmborg, Assistant Legal Adviser for Administration and Consular Affairs, Department of State, from Thomas E. Kauper, Acting Assistant Attorney General, Office of Legal Counsel at 2 (Dec. 12, 1969) ("Kauper Letter"). Noting that "some method of Presidential exercise of the decision making function is retained, such as provision for notification of and approval by the President prior to the signing," we observed that "[t]his form of delegation has been used in the past with respect to delegations of authority to sign commissions of military officers, postmasters and United States marshals." *Id.*[10] More generally, we have concluded that "[w]here the President's signature is to appear on a document, the signature generally may be affixed by any means, such as by someone else authorized to sign the President's name or by the use of a mechanical signature device." Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Delegation of the President's Authority to Physically Sign Documents* at 7 (1969) ("Rehnquist Memorandum") (accompanying Letter for John D. Ehrlichman, Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel (Mar. 20, 1969) ("Rehnquist Letter")). Accordingly, we have explained that, at least as a general matter,

> The question of whether the President should manually sign his name to a document is primarily one of propriety rather than of law, and it is within the President's discretion to determine which documents he wishes to personally sign and those with respect to which

---

[10] There was apparently no statutory requirement that the President sign the warrants. Accordingly, we could see "no legal impediment to the President's delegating to the Secretary [of State] either (1) only the authority to physically sign the warrants, or (2) the authority to issue the warrant as well as to sign it." Kauper Letter at 1. We indicated that if "the decision to issue the warrant as well as the signing function is to be delegated to the Secretary," a formal delegation pursuant to 3 U.S.C. § 301 (rather than the procedure discussed in the text) would be proper and that "the form of the warrant would have to be revised so as to show that it is issued by the Secretary rather than by the President." *Id.* at 2–3.

> he wishes to delegate the signing to someone else in his behalf or have his own signature written or affixed by means other than his own hand.

Rehnquist Memorandum at 9. Thus, the Department of Justice has long recognized that under the principle of signatures, an executive officer, including the President, may sign a document, within the meaning of various statutory signing requirements, by directing that his signature be affixed to it by another.

### C.

Our understanding of the common law meaning of "sign" at the time the Constitution was drafted and ratified and during the early years of the Republic, as well as the opinions of Attorneys General and the Department of Justice applying the principle of signatures, lead us to conclude that the President may sign a bill within the meaning of Article I, Section 7 without personally affixing his signature to it with his own hand. Rather, consistent with the principle of signatures, the President may sign by directing a subordinate to affix the President's signature to a bill that the President has approved and decided to sign.

We do not suggest that the President may delegate the decision *whether* to "approve[]" and "sign" a bill. U.S. Const. art. I, § 7, cl. 2. It has long been the view of the Executive Branch that the President may not delegate this decision. As Attorney General Cushing explained 150 years ago, "[The President] approves or disapproves of bills which have passed both Houses of Congress: that is a personal act of the President, like the vote of a Senator or Representative in Congress, not capable of performance by a Head of Department or any other person." *Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 465 (1855); *see also Presidential Succession and Delegation in Case of Disability*, 5 Op. O.L.C. 91, 94 (1981) (listing "[t]he power to approve or return legislation" among the "nondelegable functions of the President"); Memorandum for the Attorney General, from Nicholas deB. Katzenbach, Assistant Attorney General, Office of Legal Counsel, *Re: Delegation of Presidential Powers to the Vice President* at 2 (June 22, 1961) (same); *cf. Eber Bros. Wine & Liquor Corp. v. United States*, 337 F.2d 624, 628 (Ct. Cl.) ("[The President] alone can approve or veto legislation; that authority cannot be delegated. Whatever the help a President may have, the ultimate decision must be his."), *cert. denied*, 380 U.S. 950 (1964). And with respect to signing bills, this Office has likewise stated that "[t]here is no doubt that the responsibility is meant to be that of the President alone. He alone for the executive branch participates in the legislative process." Wilkey Memorandum at 2. Thus, although the President generally has considerable discretion to delegate power conferred on him by the Constitution, *see Myers v. United States*, 272 U.S. 52, 117 (1926), or statute, *see* 3 U.S.C. §§ 301–303 (2000), we do not question the substantial authority supporting the view that the President must personally decide whether to approve and sign bills.

Yet it does not follow from such a requirement that when the President *has* approved and decided to sign a bill, he cannot do so by directing a subordinate to carry out the ministerial act of affixing the President's signature to it. As our review of the common law and Department of Justice opinions shows, the principle of signatures supports this type of signing. It is true that cases applying the principle of signatures in the context of agency law ordinarily did not distinguish a delegation of authority to make the decision *whether* to sign from an instruction to perform the ministerial act of affixing the principal's signature to a document once the *principal* has made that decision. Indeed, because it was generally so easy for a principal to delegate broad authority, there was little reason for courts to address this distinction. Given that the law of signatures permitted a principal to authorize a person both to decide whether to sign a document and to perform the ministerial act of affixing the principal's signature to the document on the principal's behalf, however, we believe it follows *a fortiori* that the same legal principle would also permit a principal to exercise the lesser power of instructing a person to carry out the ministerial act of affixing the principal's signature to a document the principal has decided to sign. As Justice Story explained:

> By the general theory of our municipal jurisprudence . . . every person is invested with a general authority to dispose of his own property, to enter into contracts and engagements, and to perform acts, which respect his personal rights, interests, duties, and obligations, except in cases where some positive or known disability is imposed upon him by the laws of the country, in which he resides, and to which he owes allegiance. Every person not under such a disability, is treated as being *sui juris*, and capable, not only of acting personally in all such matters by his own proper act, but of accomplishing the same object through the instrumentality of others, to whom he may choose to delegate, either generally, or specially, his own authority for such a purpose. In the expanded intercourse of modern society it is easy to perceive, that the exigencies of trade and commerce, the urgent pressure of professional, official, and other pursuits, the temporary existence of personal illness or infirmity, the necessity of transacting business at the same time in various and remote places, and the importance of securing accuracy, skill, ability, and speed in the accomplishment of the great concerns of human life, must require the aid and assistance and labors of many persons, in addition to the immediate superintendence of him, whose rights and interests are to be directly affected by the results. Hence the general maxim of our laws, subject only to a few exceptions above hinted at, is, that whatever a man *sui juris* may do of himself, he may do by another; and as a correlative of the maxim, that what is done by another is to be deemed done by the party himself.

*Story on Agency* § 2.

As Justice Story's explanation makes clear, the overriding purpose of the law of agency was to facilitate executing the intent of individuals. For this reason, there is no doubt that if the law ordinarily allows a principal to delegate broad authority to decide which documents to sign, it would also allow him to take the lesser step of instructing another person to execute the ministerial task of placing the principal's signature on a document the principal has determined to sign. Indeed, as is evident from the opinions discussed above, the Department of Justice has repeatedly "distinguishe[d] between the physical signing of a document and the decision-making function involved with respect to the document," Memorandum for William E. Casselman II, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Re: Types of Documents Which Must Be Personally Signed by the President* at 1 (Mar. 5, 1975) ("Scalia Memorandum"), and has concluded that an executive officer may direct a subordinate to perform the former while retaining the latter, *see, e.g.*, *Affixing Facsimile Signatures to Orders*, 31 Op. Att'y Gen. at 351; Wheat Memorandum at 9; Rankin Memorandum at 2–3. And even if the broader decision-making authority cannot be delegated, we believe the lesser power to direct another to perform a ministerial act remains.[11] Moreover, as the authorities discussed above make clear, when the President directs a subordinate to affix the President's signature to a bill the

---

[11] While the principle of signatures generally required the principal's presence for his signature validly to be affixed to a document by another person otherwise lacking authority to act on the principal's behalf, we do not believe that inability of the President to delegate the decision whether to approve and sign a bill means that his presence is required when his signature is affixed to a bill he has approved and decided to sign, so long as the person affixing the President's signature to the bill has been properly and specifically authorized to perform that ministerial act. The purpose of the presence requirement appears to have been to provide a principal with control over acts done in his name in the absence of some other valid grant of authority that would otherwise constrain his agent. *See, e.g.*, *Kime v. Brooks*, 31 N.C. 218, 220 (1848) ("what a person does in the presence of another, in his name and by his direction, is the act of the latter, as if done exclusively in his own person; but that what is done out of his presence, though by his direction and in his name, cannot in law be considered an act in *propria persona*, but one done by authority"); *id.* at 221 (agent's act of signing, sealing, and delivering of deed was not in principal's physical presence and could not be said to be the principal's act "in that he saw or knew or could know of his own knowledge, that [the agent] was in fact doing what he directed her; but it rested on his confidence, that she would pursue his directions, and in her testimony that she did pursue them"). That requirement should not apply, however, when a principal properly and specifically authorizes a subordinate to affix the principal's signature to a document. Accordingly, as noted above, the Department has properly substituted specific authorization for presence in situations where an executive officer retains the decision-making function associated with a signature requirement but directs another to perform the manual act of affixing the officer's signature. *See, e.g.*, *Signing Certificate Attached to Farm Loan Bonds*, 31 Op. Att'y Gen. at 147–48; *Affixing Facsimile Signatures to Orders*, 31 Op. Att'y Gen. at 351; Wheat Memorandum at 9; Rankin Memorandum at 2–3. It follows that the President need not be present when his signature is affixed, pursuant to the President's specific authorization, to a bill the President has approved and decided to sign. And so long as the authorization is limited to this ministerial act, no improper delegation of the President's constitutional responsibilities has occurred.

President has approved and decided to sign, it is in legal contemplation the President who signs the bill, not the subordinate, who merely performs a ministerial act pursuant to the President's specific instructions.

## II.

Precedent and practice under the related provisions of Article I, Section 7 provide additional support for our conclusion that the President may sign a bill by directing that his signature be affixed to it by a subordinate. In addition to directing the President to "sign" a bill he approves, Article I, Section 7 also directs that bills that pass both Houses of Congress "shall . . . be presented to the President," and that if the President does not approve a bill "he shall return it, with his Objections to that House in which it shall have originated." In other words, the Constitution requires that the President be presented with bills, and, as a general matter, that he sign bills he approves and return bills he disapproves.[12]

The presentment and return provisions have not been interpreted to require the President to receive or return a bill with his own hands. Rather, since at least the early twentieth century,

> enrolled Bills have not been presented to the President in person, except in the case of the Bank Holiday Bill of 1933 and Bills passed on the eve of *sine die* adjournment of the Congress. The usage has been for the Committee on Administration of either the House or the Senate, after the Bill has been signed by the Speaker of the House and the Presiding Officer of the Senate, to send a clerk to the White House with the enrolled Bill and deliver it to a legislative clerk in the records office of the White House, who signs a receipt for it. The Committee on Administration then reports to the House or Senate "that this day they presented to the President of the United States, for his approval, the following Bills."
>
> For many years this has been understood to constitute presentation to the President.

*Eber Bros.*, 337 F.2d at 635 (Whitaker, J., concurring); *accord id.* at 629 (majority); *cf. id.* at 631 n.15 ("Delivery to an authorized aide in the President's immediate entourage would undoubtedly be equivalent to personal delivery to the President."). Thus, as we have previously explained, "[w]hen the President is in

---

[12] In the event that the President neither signs nor returns a bill within ten days of its presentation to him, Article I, Section 7 further provides that the bill "shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law." U.S. Const. art. I, § 7, cl. 2. *See generally Wright v. United States*, 302 U.S. 583, 590 (1938) (analyzing this provision); *The Pocket Veto Case*, 279 U.S. 655 (1929) (same).

the United States, presentation does not require delivery to him personally; rather it is done by delivery of the bill to one of the legislative clerks on the White House staff." *Presentation of Enrolled Bills—Absence of the President*, 2 Op. O.L.C. 383, 383 (1977). This is not to say that the bill is not *presented* to the President within the meaning of the Constitution, but only that the ministerial process of physically accepting delivery of the bill from Congress may, if the President so directs, be carried out by a subordinate.

Similarly, when the President disapproves a bill and decides to return it to the house of Congress in which it originated, the accepted practice has been for the President to return the bill by way of a messenger. *See Wright v. United States*, 302 U.S. 583, 590 (1938). Again, it is *the President* who returns the bill even though, pursuant to the President's instructions, someone other than the President physically delivers it to Congress. The Supreme Court has implicitly approved this practice. In addressing whether the President could return a bill to a house of Congress that had gone into a recess for three days but had appointed an agent to accept bills, the Court explained:

> [A] rule of construction or of official action which would require in every instance the persons who constitute the Houses of Congress to be in formal session in order to receive bills from the President would also require the person who is President personally to return such bills.

*Id.* at 591–92 (quoting approvingly from Brief for Amicus Curiae Committee on the Judiciary of the House of Representatives, *The Pocket Veto Case*, 279 U.S. 655 (1929)). Explaining that "[t]he Constitution does not define what shall constitute a return of a bill or deny the use of appropriate agencies in effecting the return," *id.* at 589, the Court held that a bill could in these circumstances be returned by delivery to an agent authorized to accept it on behalf of the originating house.

The Court's apparent rejection of a construction of Article I, Section 7's return provision that would require the President physically to carry a bill he disapproves to Congress, like the settled understanding that bills need not be presented to the President by physical delivery into the President's hands, suggests that this section's related provision directing that the President sign a bill he approves should not be interpreted to require the President personally to perform the ministerial act of affixing his name to a bill he has decided to sign. As we previously indicated, "[w]e do not believe that the requirement that a President 'sign' a bill in order to manifest his approval of it requires that he personally put pen to paper any more than the requirement that he manifest his disapproval by 'return[ing] it, with his Objections to that House in which it shall have originated,' U.S. Const. art I, § 7, cl. 2, requires that he personally deliver the rejected bill to Congress. We believe, instead, that the word 'sign' is expansive enough to include the meaning of 'cause the bill to bear the President's signature.'" Whelan Memorandum at 1.

Indeed, it would create serious anomalies to interpret the signing provision, but not the return and presentment provisions, to require personal ministerial action by the President. Under such an interpretation, when the President is unavailable due to travel or some other reason, Congress could present a bill to him by delivering it to the White House and the President could disapprove that bill simply by directing a messenger or aide to return it to Congress. The President could not, however, approve and sign the bill—simply because he would be unable personally to perform the ministerial act of affixing his signature to it. This anomalous interpretation would prevent the President from exercising his constitutional "duty . . . to examine and act upon every bill passed by Congress." *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 453 (1899). Yet if the word "sign" is read, consistent with its traditional common law meaning and Attorney General and Department of Justice opinions interpreting analogous statutory signing requirements, to permit the President to direct a subordinate to affix the President's signature to a bill the President has approved and decided to sign, the President's power to approve bills can be preserved in all situations.

Our conclusion also finds support in the latitude traditionally exercised by Congress and the President in determining how to execute the ministerial duties associated with the presentment and return requirements. For example, the Constitution's Presentment Clause does not specify the manner in which a bill should be presented to the President. Since 1789, however, Congress has implemented this requirement by directing the engrossing of a bill after it passes one house, and the enrollment of a bill after it passes both houses. This enrolled bill is then signed by the presiding officers of both houses and presented to the President. *See* 1 Annals of Cong. 57–58 (Aug. 6, 1789); *see also* J.A.C. Grant, *Judicial Control of the Legislative Process: The Federal Rule*, 3 W. Pol. Q. 364, 365–69 (1950) (explaining development of enrollment requirement).[13] As the Supreme Court has explained, "the signing by the speaker of the house of representatives, and by the president of the senate, in open session, of an enrolled bill, is an official attestation by the two houses . . . to the president" that the bill "has received, in due form, the sanction of the legislative branch of the government, and that it is

---

[13] The precise procedures required for enrollment have varied slightly over the years. Current law provides:

> Every bill or joint resolution in each House of Congress shall, when such bill or resolution passes either House, be printed, and such printed copy shall be called the engrossed bill or resolution as the case may be. Said engrossed bill or resolution shall be signed by the Clerk of the House or the Secretary of the Senate, and shall be sent to the other House, and in that form shall be dealt with by that House and its officers, and, if passed, returned signed by said Clerk or Secretary. When such bill, or joint resolution shall have passed both Houses, it shall be printed and shall then be called the enrolled bill, or joint resolution, as the case may be, and shall be signed by the presiding officers of both Houses and sent to the President of the United States.

1 U.S.C. § 106 (2000).

delivered to him in obedience to the constitutional requirement that all bills which pass congress shall be presented to him." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672 (1892).

Nevertheless, Congress has reserved for itself the authority to waive or relax the enrollment requirement. According to 1 U.S.C. § 106, "[d]uring the last six days of a session such engrossing and enrolling of bills and joint resolutions may be done otherwise than as above prescribed, upon the order of Congress by concurrent resolution." Congress has frequently exercised this authority. For example, Congress relaxed the requirements of section 106 "with respect to the printing (on parchment or otherwise) of the enrollment of any bill or joint resolution making general appropriations or continuing appropriations for the fiscal year ending September 30, 2000." Pub. L. No. 106-93, 113 Stat. 1310 (1999). Instead, Congress determined that "[t]he enrollment of any such bill or joint resolution shall be in such form as the Committee on House Administration of the House of Representatives certifies to be a true enrollment." *Id.* Similarly, to avoid "the great labor of enrolling by hand," Congress in 1874 considered suspending outright "the joint rule [then] requiring bills to be enrolled in parchment [to] allow certain House bills . . . to be presented to the President as engrossed in the House and amended in the Senate," before ultimately relaxing the enrollment rule to require only that "the bills in question should be 'printed upon paper, and duly examined and certified by the Joint Committee on Enrolled Bills provided by the joint rules.'" 4 *Hinds' Precedents* § 3442; *see also* 1 U.S.C. § 106 notes (collecting congressional departures from the ordinary enrollment requirements); *Preparation of Slip Laws from Hand-Enrolled Legislation*, 13 Op. O.L.C. 353, 355 (1989) (noting Congress's "occasional departure from the normal process of preparing printed enrollments of bills before presenting them to the President").

Similarly, the President and Congress have exercised flexibility in determining how best to present bills to the President when he is traveling abroad. Thus, despite the "familiar practice" of "presenting a bill to the President by sending it to the White House in his temporary absence," *Wright*, 302 U.S. at 590, several presidents have entered agreements with "the congressional leadership pursuant to which no enrolled bills will be presented during [the President's] absence." *Presentation of Enrolled Bills*, 2 Op. O.L.C. at 383. For example, when President Franklin Roosevelt traveled abroad at the end of a congressional session, he sent a letter to the Vice President and the Speaker of the House stating, "[a]s I expect to be away from Washington for some time in the near future, I hope that insofar as possible the transmission of completed legislation be delayed until my return." *Id.* at 385 (reproducing letter). Furthermore, President Roosevelt wrote, "in other cases of emergency" the White House is "authorized to forward . . . any and all enrolled bills or joint resolutions . . . by the quickest means," although "[t]he White House Office will not receive bills or resolutions on behalf of the President but only for the purpose of forwarding them." *Id.* As President Roosevelt's letter indicates, when Congress delivers a bill to the White House while the President is

traveling abroad, the practice has been to accept the bill, but only for transmission to the President, not presentment. Thus, we have previously explained:

> In the unlikely event that the President is unable to obtain such a commitment from Congress, including the contingency of urgent legislation that cannot await the President's return, the President normally withdraws the legislative clerks' authority to accept enrolled bills on his behalf when he travels abroad and so advises the Congress. The bills are received by the White House staff not for 'presentation' to the President but for forwarding or transmission to the President. Presentation is then effected either when the bills actually are received by him abroad or upon his return to Washington.

*Id.* at 384; *see also Eber Bros.*, 337 F.2d at 625 (noting that bills received at the White House during the President's absence were stamped with the legend "Held for presentation to the President upon his return to the United States."). In short, as the Court of Claims has explained, "presentation can be made in any agreed manner or in a form established by one party in which the other acquiesces." *Eber Bros.*, 337 F.2d at 629.

The same flexibility is evident in the manner in which the Supreme Court has permitted Congress to receive bills returned by the President. As noted above, in *Wright*, the Court concluded that one house of Congress could appoint an agent to receive bills returned by the President when that house went into recess for three days. The Court explained:

> To say that the President cannot return a bill when the House in which it originated is in recess during the session of Congress, and thus afford an opportunity for the passing of the bill over the President's objections, is to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right.

*Id.* at 590.

Just as the presentment and return requirements have been understood and applied to give the President and Congress flexibility with respect to ministerial detail so long as the essential aspects of these requirements are performed by the appropriate constitutional actors, so also the signature requirement should be understood to give the President similar latitude to determine how his signature will be affixed to a bill once he has personally made the constitutionally essential decision to approve and sign it. The longstanding precedent and practice regarding the presentment and return provisions thus support our conclusion that the President may direct a subordinate to affix the President's signature to a bill the President has approved and decided to sign.

## III.

In reaching our conclusion, we recognize that from the Founding to the present day, the President has always signed bills by personally affixing his signature to them. Moreover, in recent years some unpublished opinions of this Office (though not our most recent opinion, *see* Whelan Memorandum) have suggested a constitutional basis for this practice. *See* Rehnquist Letter at 2 (concluding that "*with the exception of signing bills passed by Congress*, there is no legal impediment to the delegation of the act of signing and that the question of which documents the President should personally sign is largely one of propriety rather than of law") (emphasis added); Scalia Memorandum at 1 (citing Rehnquist Memorandum and stating that "[t]he signing of bills passed by the Congress is one exception which *may* require the President's personal signature") (emphasis added); Memorandum for the Files, from Ralph W. Tarr, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Presidential Signing of Bankruptcy Extension Act* at 9–10 (June 13, 1984) ("Tarr Memorandum") ("We therefore concluded that it was necessary for the President physically to sign the bill in order for it to become a law."); *cf.* Wilkey Memorandum at 10 ("a bill would seem to present an *a fortiori* case in which under the Constitutional provision the signification of the President's approval requires an exercise of personal discretion and therefore cannot be delegated"); Rehnquist Memorandum at 2 ("the requirement for the President's signature as well as his decision approving a bill would appear to be non-delegable"). Indeed, on at least two occasions, a bill was flown halfway around the world, on the advice of this Office, so that the President could personally affix his signature to it. *See* Tarr Memorandum at 9 (China); *see also* Memorandum for the Files, from Jeffrey P. Singdahlsen, Attorney-Adviser, Office of Legal Counsel, *Re: Preliminary Advice and Consideration Regarding Proposal to Fax Continuing Resolution to the President While He Was Abroad* at 1 (Dec. 22, 1999) (Turkey).

Nevertheless, we do not think that the question presented in this memorandum would have had practical significance at the time the Constitution was drafted and ratified or at the time the practice regarding the President's signature of bills was established. Current technology enables the President, without being physically presented with the enrolled bill, to be informed of a bill's precise contents for consideration and approval (for example by receiving a copy of the bill by e-mail or fax) more rapidly than he could receive the enrolled bill itself for approval and signature. This was not the case at the time the Constitution was drafted and ratified or during the early years of the Republic, however. For this reason, we believe that the historical practice should be viewed not as rejecting the position we adopt today, but rather as simply reflecting the practical reality that for much of our Nation's history the President was precluded by circumstance and technological limitations from approving and signing a bill that had not been physically delivered to him.

Furthermore, as discussed above, opinions of the Attorney General and the Department of Justice have recognized and applied the principle of signatures in many other contexts and are in that respect consistent with our conclusion. And, despite our Office's reluctance to extend the principle fully to the constitutional requirement that the President sign bills, even in this context our opinions have suggested some degree of flexibility consistent with the principle of signatures. For example, this Office has relied on the principle of signatures in concluding that the President may "sign" a bill by affixing his initials, rather than his full name. *See* Wilkey Memorandum at 3; *see also id.* at 9 n.5 (quoting *Finnegan*, 157 Mass. at 440) ("'It was and still is very generally held that when a document is required by the common law or by statute 'to be signed' by a person, a signature of his name in his own proper or personal handwriting is not required.'")). Similarly, we have suggested that "[i]f the President's hands only were to become disabled so that he could not personally sign his name, obviously some other means for affixing his signature would have to be used. Otherwise, no legislation could be approved because of the signing requirement of Article I, section 7 of the Constitution." Rehnquist Memorandum at 8.

More fundamentally, our opinions suggesting that the President himself must physically affix his signature to bills appear to be based on the generally accepted understanding—which we in no way call into question—that the President cannot delegate the *decision* to approve and sign a bill.[14] The method of signing a bill that we approve here, however, does not entail any delegation of this decision—rather it simply involves a ministerial act performed by a subordinate at the President's specific direction. As discussed above, the Department of Justice has repeatedly

---

[14] To the extent earlier opinions of this Office proceed beyond the principle that the President may not delegate the decision to approve and sign a bill and conclude that he must personally perform the ministerial act of physically affixing his signature to the bill, they rely only on cursory recitations of the constitutional text and inferences from statements in Supreme Court cases addressing other matters. But as explained above, we do not think the text of Article I, Section 7 bars the President from signing a bill, consistent with the principle of signatures, by directing a subordinate to affix the President's signature to a bill the President has approved and decided to sign. Nor is such a conclusion compelled by Supreme Court precedent. In *Gardner v. Collector*, 73 U.S. (6 Wall.) 499 (1867), the Court stated, in the course of holding that the President need not date a bill he signs, that "[t]he only duty required of the President by the Constitution in regard to a bill which he approves is, that he shall sign it. Nothing more. The simple signing his name at the appropriate place is the one act which the Constitution requires of him as the evidence of his approval, and upon his performance of this act the bill becomes a law." *Id.* at 506. Although we have previously stated that "[t]he Court's language emphasizes the personal nature of the duty required of the President, thus precluding considerations of delegation," Wilkey Memorandum at 3, we think the Court's language is better understood simply as restating the text of Article I, Section 7, and not as addressing the question we consider here. Another Supreme Court case (which did not involve the President or Article I, Section 7) states that "[i]t may be assumed that a requirement of the officer's signature, without more, means that he shall write his name or his distinctive appellation." *Ohl & Co. v. Smith Iron Works*, 288 U.S. 170, 176 (1932). That case, which held that an official could sign by initialing a document, did not address the question whether an officer could sign a document by directing that his signature be affixed to it by another.

"distinguishe[d] between the physical signing of a document and the decision-making function involved with respect to the document." Scalia Memorandum at 1; *see also, e.g.*, *Affixing Facsimile Signature to Orders*, 31 Op. Att'y Gen. at 351; Wheat Memorandum at 9; Rankin Memorandum at 2–3. Indeed, despite sometimes imprecise usage of the word "delegation," the Department's opinions appear to recognize correctly that so long as the President retains this decision-making function, his instruction to a subordinate to affix the President's signature to a document does *not* amount to a delegation of presidential authority in any meaningful or legally significant sense. Thus, 3 U.S.C. § 301, which generally authorizes the President to delegate "any function which is vested in [him] by law" to the head of any department or agency, or any other officer required to be appointed by the President by and with the advice and consent of the Senate, also requires that such delegations be "in writing" and "published in the Federal Register." Nevertheless, we have concluded that "[w]here the only act delegated is the act of signing, it is not necessary to formally delegate the signing function by issuance of an Executive order and publication in the Federal Register pursuant to 3 U.S.C. § 301." Kauper Letter at 2; *see also* Rehnquist Memorandum at 6 ("Even where there is a specific statutory reference to the President's signing a document, the practice has apparently been not to formally delegate the authority to sign documents on behalf of the President by publication in the Federal Register."). Similarly, we have approved the "delegation of authority to members of the White House staff to *physically* sign documents" even though, under section 301, "it would not be proper for the President to delegate decision-making authority to members of the White House staff" who are not appointed by and with the advice and consent of the Senate as this statute requires. Rehnquist Letter at 1 (emphasis added).

The Department's opinions provide no basis for concluding that an instruction that does not amount to a delegation of presidential authority for purposes of section 301 should nonetheless be regarded as such a delegation for constitutional purposes, and, for the reasons explained above, *see supra* Part I.C, we believe it should not be so regarded. Rather, as we previously explained, so long as the President personally makes the decision to approve and sign a bill, "the principle that the President may not *delegate* to another person his authority to sign a bill . . . means, for example, that if a White House aide were to sign his own name to a bill, that bill would not thereby become law. By contrast, the President's directive to an aide to affix the President's signature to a bill does not involve a delegation of authority." Whelan Memorandum at 2. And, if a presidential instruction to affix the President's signature to a document the President has decided to sign does not amount to a delegation of presidential authority, we are aware of no basis for distinguishing a statutory requirement that the President sign a document (which the Department has repeatedly held can be satisfied through such an instruction) from the constitutional requirement that the President sign bills he approves. *Cf.* U.S. Const. art. VI (establishing that the "Supreme Law of

the Land" includes both the "Constitution" and "Laws of the United States which shall be made in Pursuance thereof").

Accordingly, we conclude that neither past practice nor previous opinions relating to the signing requirement of Article I, Section 7 foreclose reading that requirement in a manner that is consistent with the traditional common law understanding of "sign," with Attorney General and Department of Justice opinions applying that understanding to statutory signing requirements, and with the settled interpretation of the related presentment and return provisions.

## IV.

For the foregoing reasons, we conclude that the President need not personally perform the physical act of affixing his signature to a bill he approves and decides to sign in order for the bill to become law. Rather, the President may sign a bill within the meaning of Article I, Section 7 by directing a subordinate to affix the President's signature to such a bill, for example by autopen.[*]

HOWARD C. NIELSON, JR.
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[*] Editor's Note: A footnote providing advice concerning implementation of the authority discussed in this opinion has been redacted.